**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

STEPHANIE SLOSS,

        *Plaintiff,*

    vs.

OIL REGION RECOVERY, INC.

        *Defendant*.

Civil Action No. 1:23-cv-143

**JURY TRIAL DEMANDED**

## COMPLAINT IN CIVIL ACTION

Plaintiff, Stephanie Sloss, by and through the undersigned counsel, now files the within Complaint in Civil Action, averring as follows:

### PARTIES

1.     Stephanie Sloss (hereinafter, "Plaintiff" and/or "Ms. Sloss"), is an adult individual who currently resides at 412 Rocky Grove, Apartment B, Franklin, Pennsylvania 16323.

2.     Oil Region Recovery, Inc. (hereinafter, "Defendant" and/or "ORR") owns and operates Oil Recovery Treatment Center located at 290 Hudmont Lane, Polk, Pennsylvania 16342. (hereinafter, "The Facility").

### JURISDICTION AND VENUE

3.     Plaintiff brings this lawsuit pursuant to the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101, *et seq*. (hereinafter, the "ADA"), Title VII of the Civil Rights Act, 42 U.S.C. § 2000, *et seq.*, (hereinafter, "Title VII"), the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. § 951, *et seq.* (hereinafter, the "PHRA"), 42 U.S.C. § 1981 (hereinafter, "Section 1981") and the Equal Pay Act 1963, 29 U.S.C., Chapter 8 § 206(d)) (hereinafter, the "EPA").

4.      The District Court has subject-matter jurisdiction over the ADA, Title VII, EPA and Section 1981 claims under Title 28 U.S.C. § 1331 and supplemental jurisdiction over the PHRA claims under Title 28 U.S.C. § 1367.

5.      Plaintiff has satisfied all procedural and administrative requirements set forth in 29 U.S.C. § 626, and 42 U.S.C. § 2000e-5 in that:

    a.  Plaintiff filed a timely administrative charge of discrimination and retaliation on or about August 16, 2022, with the Equal Employment Opportunity Commission (hereinafter, the "EEOC") that was dual filed with the Pennsylvania Human relations Commission (hereinafter, the "PHRC")

    b.  On February 14, 2023, Plaintiff received a neutral dismissal and notice of right to sue letter from the EEOC, wherein Plaintiff was afforded ninety (90) days within which to timely file an action in federal court.

## FACTUAL ALLEGATIONS

6.      Ms. Sloss is an adult, African American, female.

7.      Ms. Sloss is disabled under the meaning of the Americans with Disabilities Act (hereinafter, the "ADA") with the cognitive disabilities of General Anxiety Disorder (hereinafter, the "Anxiety"), Post Traumatic Stress Disorder (hereinafter, the "PTSD"), Major Depressive Disorder (hereinafter, the "Depression") and addiction recovery (hereinafter, the "Addiction") (collectively, the Anxiety, the PTSD, the Depression and the Addiction shall be hereinafter referred to as the "Disabilities").

8.      ORR's Facility provides withdrawal management, short- and long-term inpatient, outpatient, and intensive outpatient program services to Western Pennsylvanians suffering from substance abuse disorders.

9.      Ms. Sloss began working for ORR at the Facility on or about December 7, 2020, in the position of part-time "Program Assistant."

10.    At the initiation of her employment with ORR, Ms. Sloss was compensated at a rate of $11.00 per hour.

11.    As part-time assistant, Ms. Sloss was responsible for assisting clients with their daily needs, transportation, and distributing meals and medication.

12.    Ms. Sloss was hired by ORR's Clinical Director, Dan Richardson (hereinafter, "Mr. Richardson").

13.    ORR did not inquire whether Ms. Sloss was disabled during the interview process and accordingly, Ms. Sloss did not disclose her Disabilities to ORR.

14.    Shortly after being hired by ORR, Ms. Sloss became aware that she was being compensated at a lower rate of pay than similarly situated male employees.

15.    Moreover, ORR's co-owner and project manager, Christopher Taylor, (hereinafter, "Mr. Taylor") began a frequent pattern and practice of verbally harassing Ms. Sloss as their personal interactions increased over time.

16.    Mr. Taylor routinely directed unwelcome derogatory comments towards Ms. Sloss because of her race.

17.    For example, Mr. Taylor referred to Ms. Sloss as a "Tackle Box," assumptively because of her facial piercing.

18.    Ms. Sloss was humiliated and objected to the comment by telling Mr. Taylor that she observed he did not make similar comments to Caucasian employees, male and female, with facial piercings.

19.    When the comment was made, Caucasian co-workers, Andrew Stroymer (hereinafter, "Mr. Stroymer") and administrative Assistant, Cortney Russell (hereinafter, "Ms. Russell") also had multiple facial piercings but received no derogatory comments from Mr. Taylor.

20.    Plaintiff did not report Mr. Taylor's comment to ORR's Human Resources Department because Mr. Taylor's mother, Dorinda Taylor (hereinafter, "Ms. Taylor"), was the Human Resources manager and a co-owner of ORR with her son.  Ms. Sloss also previously witnessed Ms. Taylor making racially derogatory comments about an African American client while banning him from the Facility.

21.    Despite the hostile work environment perpetuated by Mr. Taylor, Ms. Sloss performed well and received raises in November of 2021 and again in December of 2021 raising her rate of compensation to $15.50 per hour.

22.    Despite the above-referenced raises in pay, Ms. Sloss was still paid less than similarly situated male employees.

23.    In December of 2021, Mr. Richardson offered Ms. Sloss a full-time counselor's assistant position which she accepted and began working in January of 2022.

24.    In March of 2022, Mr. Richardson informed Ms. Sloss that Mr. Taylor instructed her to braid a male client's hair who was also African American.

25.    Ms. Sloss complained to Mr. Richardson that braiding the hair of an adult client of the opposite sex was inappropriate, humiliating, and went well beyond her job duties.

26.    Ms. Sloss also complained to Mr. Richardson that she believed that she was being ordered to braid the client's hair because she was African American because it was not ORR's customary practice to have Caucasian counselor's assistants braid client's hair.

27.    Mr. Richardson responded to Plaintiff's complaint of racial discrimination by asserting that hair braiding was included in the phrase "all other duties" in her job description and directed her to braid the client's hair to avoid discipline and possible termination of employment.

4

28.     Ms. Sloss was humiliated, but in order to remain employed, braided the client's hair.

29.     Due to Ms. Sloss's obedience and good performance, ORR promoted her to a full-time detox counselor's assistant on June 3, 2022 and she began to work at a new detoxication facility also located at 290 Hudmont Lane, Polk, Pennsylvania 16342 (hereinafter, the "New Facility").

30.     Mr. Taylor continued to promulgate a hostile work environment at the New Facility.

31.     As way of example, on June 3, 2022, Mr. Taylor called Ms. Sloss a "Lot Lizard."

32.     Ms. Sloss was humiliated and embarrassed by the comment and never witnessed Mr. Taylor use similar derogatory comments when referring to similarly situated Caucasian employees.

33.     Mr. Taylor also referred to Ms. Sloss as a prostitute by telling her that she belonged at the "the Barkeyville Truck Stop," a local business that is infamous for alleged prostitution.

34.     Again, Ms. Sloss was humiliated by the comment and objected to it directly to Mr. Taylor and by reporting it to her direct supervisor, David Chambers (hereinafter, "Mr. Chambers"). Mr. Chambers promised Ms. Sloss that he would forward her complaint to Mr. Richardson.

35.     Despite Ms. Sloss's objections, Mr. Taylor repeated the comment to Ms. Sloss throughout the week resulting in Mr. Richardson complaining to Mr. Taylor.

36.     Ms. Sloss witnessed Mr. Richardson advise Mr. Taylor to stop making such comments.

37.    Mr. Taylor initially became angry and denied making the comments but then admitted making the comment, however, explained to Ms. Sloss and Mr. Richardson that, "[He] didn't mean it."

38.    Immediately after objecting to Mr. Taylor's comments, on July 14, 2022, Mr. Taylor retaliated against Ms. Sloss and removed her from the detox counselor's assistant position and demoted her to an "inpatient counselor."

39.    Although there was no pay difference between the positions, Ms. Sloss considered the move a demotion because it removed her from a position that she was promised since December of 2021 and it removed her from a new department she successfully helped establish.

40.    Mr. Taylor intended the change in Ms. Sloss's position to humiliate her and upset her, which it did.

41.    As further evidence of racial discrimination and retaliation, Ms. Sloss discovered her detox counselor's assistant position was being given to a newly hired Caucasian male, Joe Myers (hereinafter, "Mr. Myers").

42.    Mr. Richardson explained to Ms. Sloss that the decision was not retaliation, but rather Mr. Taylor fulfilling a prior promise to Mr. Myers.

43.    Mr. Richardson also instructed Ms. Sloss to perform Mr. Myers's duties as a detox counselor's assistant when Mr. Myers was unavailable to perform them, meaning she was instructed to be ready to perform two (2) jobs at once without receiving additional compensation.

44.    Ms. Sloss complained that the decisions were discriminatory and that she could not recall Caucasian coworkers being instructed to cover for her when she was not available.

45.    ORR also paid Mr. Myers a higher hourly rate than what was provided to Ms. Sloss while they were in the detox counselor's assistant position.

46.     Beginning in June of 2022, Ms. Russell began bringing her pet dog, "Stevie," to work each day.

47.     Two (2) months later, on or about August 4, 2022, Ms. Sloss acquired a registered emotional support animal, a puppy named "Miles Jeffrey," who accompanied her to work to help her cope with the discrimination and hostile work environment she was suffering which were exacerbating the symptoms associated with her Disabilities.

48.     As soon as Mr. Taylor saw the emotional support animal, he rushed toward Ms. Sloss and told her that dogs are not permitted at work.

49.     Ms. Sloss responded by informing Mr. Taylor that her dog was a registered support animal to assist her with her Disabilities.

50.     Ms. Sloss made the reasonable request for accommodation in the form of being permitted to have her support animal with her at work.

51.     Mr. Taylor denied the request outright and told Ms. Sloss that dogs are not allowed at work.

52.     Ms. Sloss asked why Ms. Russell was permitted to bring her dog to work when she is not disabled and the animal was not a support animal.

53.     Mr. Taylor explained that Ms. Russell was "grandfathered in" and continued by saying, "I said so" and "Ms. Russell is special, and you are not."

54.     Ms. Sloss was shocked and became upset by Mr. Taylor's position and argued that she should be permitted the accommodation for her Disabilities.

55.     Mr. Taylor mocked her request for accommodation by saying, "If you need an emotional support animal, you are not fit to work here" and continued "People with anxiety and depression also smoke weed, go see where that gets you."

56.    Mr. Taylor ended the meeting by telling Ms. Sloss her dog was "Not allowed, no exceptions."

57.    Ms. Sloss was stunned and very upset by the mocking words and the blatant discrimination.

58.    The next day, on August 5, 2022, Ms. Sloss returned to work with her dog and documentation proving her dog was a registered emotional support animal with the intent of changing Mr. Taylor's mind.

59.    Because she was told there would be no exceptions to the animal policy, Ms. Sloss also emailed her resignation letter to Mr. Chambers.

60.    In the letter, Ms. Sloss informed ORR she would be leaving in two (2) weeks.

61.    Ms. Sloss informed Mr. Chambers that she is resigning because Mr. Taylor would not permit her to have a support animal at work although Ms. Russel, who is not disabled, was allowed to do so.

62.    Ms. Sloss informed Mr. Chambers that she needed the accommodation to continue working for ORR.

63.    Mr. Richardson asked Ms. Sloss not to resign, but also gave no assurances that he could accommodate Ms. Sloss.

64.    Ms. Sloss informed Mr. Chambers that she could continue to work for ORR if they accommodated her.

65.    Ms. Sloss returned to work with her support animal on Saturday, August 6, 2022, without issue.

66.     Ms. Sloss arrived at work with her support animal on Tuesday, August 9, 2022. Mr. Taylor angrily met Ms. Sloss in the ORR parking lot and again told her she could not bring her support animal to work.

67.     Ms. Sloss again explained that the dog was a registered emotional support animal and argued that she should be allowed to have her requested accommodation.

68.     Ms. Sloss informed Mr. Taylor that she submitted her resignation and "two-weeks' notice" because of his "no dogs allowed" policy that only applied to her.

69.     Ms. Sloss asked Mr. Taylor whether his decision was racially motivated but received no response other than Mr. Taylor repeating the "no dogs allowed" policy and walking away.

70.     Later in the day on August 9, 2022, Mr. Richardson terminated Ms. Sloss at the request of Mr. Taylor.

71.     ORR terminated Ms. Sloss without providing her with any form of progressive discipline.

72.     ORR terminated Ms. Sloss without receiving any credible complaint about her support animal misbehaving or disrupting business operations.

73.     After Ms. Sloss was terminated, ORR continued to permit Ms. Russell to bring her pet dog to work.

74.     After Ms. Sloss was terminated, ORR permitted a similarly situated Caucasian counselor, Erin (last name unknown) (hereinafter, "Ms. Erin") to bring her pet dog to work daily in 2023.

## COUNT I
## FAILURE TO ACCOMMODATE IN VIOLATION OF THE ADA AND PHRA
### 29 U.S.C. §§ 621, *et seq.* and 43 Pa. Cons. Stat. § 951, *et seq.*

75.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

76.     Congress enacted the ADA in 1990 in an effort to prevent otherwise qualified individuals from being discriminated against in employment based on a disability." *Gaul v. Lucent Technologies Inc.*, 134 F.3d 576, 579 (3d Cir. 1998).  The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

77.     A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

78.     An entity discriminates against an individual on the basis of disability when, inter alia, it does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the] entity." 42 U.S.C. § 12112(b)(5)(A).

79.     Reasonable accommodations may include, inter alia, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials

or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."  42 U.S.C. § 12111(9).

80.    Congress has defined "disability" to mean, "with respect to an individual— (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment (as described in paragraph (3))." 42 U.S.C. § 12102(1).

81.    The ADA and PHRA prohibit employers from discriminating against employees for their disabilities. 42 U.S.C. § 12112; 43 Pa. Cons. Stat. § 955. To establish a prima facie case of disability discrimination, an employee must show that she "(1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006).

82.    Plaintiff is disabled under the meaning of the ADA with both physical and cognitive Disabilities.

83.    Defendant had knowledge of Plaintiff's Disabilities.

84.    Plaintiff was at all times qualified for the position held.

85.    Defendant willfully failed to accommodate Plaintiff's disability by allowing her support dog at work.

86.    The request for accommodation was reasonable as her dog did not disrupt Defendant's business and Defendant permitted at least two (2) other non-disabled coworkers to bring their pets to work.

87.    Plaintiff suffered an adverse employment action, harassment and the termination of her employment which was the direct result of being denied her reasonable request for accommodation.

88.     As a direct and proximate cause of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic loss in the form of lost back pay and emotional harm.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## COUNT II
### FAILURE TO ENGAGE IN A GOOD FAITH INTERACTIVE PROCESS IN VIOLATION OF THE ADA AND PHRA
### 29 U.S.C. §§ 621, *et seq.* and 43 Pa. Cons. Stat. § 951, *et seq.*

89.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

90.     The ADA and PHRA require employers to make reasonable accommodations for their employees' disabilities. 42 U.S.C. § 12112(b)(5)(A); see 43 Pa. Cons. Stat. § 955(h)(3.2).

91.     An employer's failure to engage in a good-faith interactive process with the employee constitutes a failure to accommodate under the ADA. *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312–13 (3d Cir. 1999).  To show such a failure, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Id. at 319–20. An employer can show good faith by, for example, "meet[ing] with the employee who requests an accommodation . . . and discuss[ing] available alternatives when the request is too burdensome." Id. at 317.

92.     The same legal standards are applied to the PHRA claim. See *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 499 n.3 (3d Cir. 2010).

93.     The Defendant knew about Plaintiff's Disabilities and limitations.

94.     Plaintiff requested a reasonable accommodation in the form of a support animal at work.

95.     Plaintiff's request was reasonable because Defendant allowed Plaintiff's coworkers to bring their pets to work.

96.     Defendant acted in bad, by dismissing Plaintiff's request to bring her support animal to work outright, without taking any action whatsoever to explore alternate accommodations.

97.     As a direct and proximate cause of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic loss in the form of lost back pay and emotional harm.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### COUNT III
**RETALIATION IN VIOLATION OF THE ADA AND PHRA**
**29 U.S.C. §§ 621, *et seq.* and 43 Pa. Cons. Stat. § 951, *et seq.***

98.     Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

99.     The ADA and PHRA allow for retaliation claims similar to the FMLA retaliation claim pursuant to 42 U.S.C. § 12203(a) and 43 Pa. Cons. Stat. § 955(d) (2020).

100.    To establish a prima facie retaliation claim under the ADA, an employee must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." See *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

101.    The employer can rebut the prima facie case by providing a "a legitimate, non-retaliatory reason for its adverse employment action," which shifts the burden back to the employee to show that the employer's reason is pretextual. Id. at 500– 01.

102.    As for the PHRA claim, the courts apply the ADA standard "except where there is something specifically different in its language requiring that it be treated differently." See *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

103.    Ms. Sloss at all times performed well and had no discipline issues prior to asserting her right to a support animal at work.

104.    Immediately after bringing her support animal to work and asserting her rights in requesting a reasonable accommodation, Ms. Sloss received verbal reprimands and a termination of employment.

105.    The short proximity of time between the assertion of her rights and her termination of employment supports the clear causal connection between said actions necessary to support a claim of retaliation.

106.    As a direct and proximate cause of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic loss in the form of lost back pay and emotional harm.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

### COUNT IV
### UNCORRECTED HOSTILE WORK ENVIRONMENT
### Title VII, 42 U.S.C. § 1981 and 43 Pa. Cons. Stat. § 951, *et seq.*

107.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

108.     To establish a hostile work environment claim under 42 U.S.C. § 1981 (and Title VII, as the Court noted) an employee must show that "(1) the employee suffered intentional discrimination because of his/her race, (2) the discrimination was severe or pervasive, (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would detrimentally affect a reasonable person in like circumstances, and (5) the existence of respondeat superior [for example, the plaintiff's supervisor] liability." See *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013).

109.     The 3rd Circuit has also noted that severe or pervasive is the correct standard under which apply a totality of the circumstances approach in examining "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." See *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993).

110.     Plaintiff identifies as African American.

111.     Plaintiff suffered a continuing series of harassing and humiliating events, perpetuated by Mr. Taylor, that were discriminatory because of her race.

112.     Many of the events were verbal, meaning when Plaintiff interacted with Mr. Taylor, Mr. Taylor frequently made unwelcome comments about her jewelry and character that humiliated Plaintiff in front of coworkers.

113.     The events also include Defendant's discriminatory employment decision, which include but are not limited to the decision to have Mr. Sloss braid hair, work two (2) positions to support a Caucasian coworker and not be allowed to have a support animal when Caucasian employee were permitted to bring their pets to work.

114.    As a direct and proximate cause of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic loss in the form of lost back pay and emotional harm.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

## **COUNT V**
### **RETALIATION FOR COMPLAINING ABOUT RACE DISCRIMINATION**
### **Title VII, 42 U.S.C. § 1981, and 43 Pa. Cons. Stat. § 951,** *et seq.*

115.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

116.    The Supreme Court has held that, as a matter of statutory interpretation, retaliation claims are cognizable under Section 1981. See *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008).

117.    Further, the Third Circuit has indicated that the legal standards for a retaliation claim under Section 1981 are the same as those applicable to a Title VII retaliation claim. See *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) ("[T]o establish a prima facie retaliation claim under Title VII [or] § 1981 … , [a plaintiff] must show: (1) that he engaged in a protected activity; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action"); See *Khair v. Campbell Soup Co.*, 893 F. Supp. 316, 335-36 (D.N.J. 1995) (noting that with respect to retaliation claims, "The Civil Rights Act of 1991 extended § 1981 to the reaches of Title VII").

118.    Ms. Sloss engaged in protected activity on numerous occasions, making multiple complaints to ORR supervisors and ownership about race discrimination.

119.    Ms. Sloss complained about derogatory comments and terms and conditions of employment which she regarded as discriminatory due to her race.

16

120.    Within a short proximity of time after receiving Ms. Sloss's explicit and/or implied complaints of race discrimination, she suffered a continuing an uncorrected hostile work environment and termination of employment.

121.    As a direct and proximate cause of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic loss in the form of lost back pay and emotional harm.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

**COUNT VI**
**DISCRIMINATORY DUTIES - RACE DISCRIMINATION**
**Title VII, 42 U.S.C. § 1981 and 43 Pa. Cons. Stat. § 951, *et seq.***

122.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

123.    Section 1981 prohibits race discrimination in the making and enforcing of contracts. See *McDonald v. Santa Fe 18 Trail Transp. Co.*, 427 U.S. 273, 295 (1976). "[A] plaintiff cannot state a claim under [Section] 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'" See *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 479-80 30 (2006).

124.    Section 1981(b) defines "the term 'make and enforce contracts' [to] include the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). This statutory definition shapes the "adverse employment action" element of Section 1981 employment discrimination claims. The Court of Appeals has stated that "a wide panoply of adverse employment actions may be the basis of employment discrimination suits under Title VII

of the Civil Rights Act and [Section] 1981." See *Clark v. Twp. of Falls*, 890 F.2d 611, 618-19 (3d Cir. 1989).

125.    During the course of her employment with ORR, Plaintiff suffered a variety of discriminatory duties because of her race.

126.    ORR forced Plaintiff to braid client's hair, cover for Caucasian coworkers and precluded her from bringing in a support animal, when the opposite held true for Caucasian employees.

127.    As a direct and proximate cause of Defendant's conduct described hereinabove, Plaintiff has suffered tangible economic loss in the form of lost back pay and emotional harm.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this Complaint, *infra*.

**COUNT VII**
**DISCRIMINATORY PAY - THE EQUAL PAY ACT OF 1963**
**29 U.S.C., Chapter 8 § 206(d)**

128.    Plaintiff incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

129.    The central provision of the Equal Pay Act is 29 U.S.C. §206(d)(1), which provides as follows:

> (d) Prohibition of sex discrimination.
> (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential

18

> based on any other factor other than sex: Provided, That an
> employer who is paying a wage rate differential in violation of this
> subsection shall not, in order to comply with the provisions of this
> subsection, reduce the wage rate of any employee.

29 U.S.C. §206(d)(1).

130.    The Supreme Court in *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974),

described the intent of the Equal Pay Act:

> Congress' purpose in enacting the Equal Pay Act was to remedy
> what was perceived to be a serious and endemic problem of
> employment discrimination in private industry--the fact that the
> wage structure of many segments of American industry has been
> based on an ancient but outmoded belief that a man, because of his
> role in society, should be paid more than a woman even though his
> duties are the same. The solution adopted was quite simple in
> principle: to require that "equal work will be rewarded by equal
> wages."

131.    Throughout the duration of her employment with ORR, Plaintiff suffered a lower

hourly rate of pay than similarly situated male coworkers and did not receive equal pay for equal

work as a result of her gender.

132.    Plaintiff was also instructed to perform more duties than her Caucasian coworkers

and was instructed to cover for her Caucasian coworker without being provided equal pay.

133.    The acts of ORR are willful, meaning ORR intentionally paid Plaintiff less money

than similarly situated men because of her gender.

134.    As a direct and proximate cause of Defendant's conduct described hereinabove,

Plaintiff has suffered tangible economic loss in the form of lost back pay and emotional harm.

WHEREFORE, Plaintiff seeks the damages set forth in the *ad damnum* clause of this

Complaint, *infra*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Stephanie Sloss, respectfully requests this Honorable Court to enter judgment in her favor and against Defendant, Oil Recovery Region, Inc. and prays for relief as follows:

1.      A declaratory judgment that Defendant's actions complained of herein have violated Plaintiff's rights under the ADA, Title VII Section 1981 and the Equal Pay Act;

2.      Award liquidated damages;

3.      General, compensatory, back pay and front pay, and special damages according to law and proof;

4.      Exemplary damages, fines and punitive damages according to law and proof;

5.      Reasonable attorney's fees and costs;

6.      An award of pre-judgment and post-judgment interest where accorded by law;

7.      Grant leave to amend to add claims under state and federal laws; and/or

8.      Such other and further relief as this Court deems just, equitable, and proper by law.

**TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,

**THE WORKERS' RIGHTS LAW GROUP, LLP**

Date: May 12, 2023                    By: */s/ Erik M. Yurkovich*
                                           Kyle H. Steenland (Pa. I.D. No. 327786)
                                           Erik M. Yurkovich (Pa. I.D. No. 83432)

                                           The Workers' Rights Law Group, LLP
                                           Foster Plaza 10
                                           680 Andersen Drive, Suite 230
                                           Pittsburgh, PA 15220
                                           Telephone: 412.910.9592
                                           Facsimile: 412.910.7510
                                           kyle@workersrightslawgroup.com
                                           erik@workersrightslawgroup.com

                                           *Attorneys for Plaintiff, Stephanie Sloss*

## **VERIFICATION**

I, Stephanie Sloss, have read the foregoing allegations in the foregoing Complaint in Civil Action and verify that the statements therein are correct to the best of my personal knowledge, information and/or belief.  I understand that this verification is made subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities, which provides that if I knowingly make false averments, I may be subject to criminal penalties.

Dated: __May 12, 2023__                    _____

                                        Stephanie Sloss